Samuel C. Coleman, J.
The plaintiff, for reconsideration of the question of the validity of the Chihuahua divorce refers to proceedings in the Heine case (10 A D 2d 967) subsequent to those I referred to (10 A D 2d 864). Neither side called my *113 attention to that case at any stage of its proceedings until judgment was about to be entered. “ Judges are presumed to know the law” even to the point of prescience. But that presumption has its support in the assistance of counsel and the wonder to me is that the case was not referred to. The wonder is even greater as the attorney for the plaintiff was assisted at the trial by an attorney who had participated in the application to the appellate court that resulted in the rewording of the opinion in the Seine case (the opinion of the Trial Judge in that case after the appeal did not cite the decision on appeal). And without reference to the Laff decision (5 Misc 2d 554, affd. 4 A D 2d 874) or any others, Seine, the most recent decision of an appellate court, holds valid a Chihuahua divorce, obtained upon personal appearance in the foreign court by the plaintiff wife followed by the husband’s appearance by attorney. The question now is not what I would or should have done if the full history of the Seine case had been before me, whether I would have followed it, or should have done so on its authority; whether I would have thought the absence of a “ certificate of residence ” or the language of the decree called for a different result. The case before me was decided on the basis of what I believed to be controlling principles, with awareness of contrary decisions. But as the argument for reconsideration proceeded largely on the effect of a notice of appearance, and as the opinion contains expressions not necessary to the precise point, I restate and expand some of my views.
I think we may start with the premise that a court granting a decree of divorce must have ‘ ‘ jurisdiction ’ ’ over the controversy between the parties. Because of the nature of the case — involving marital status — jurisdiction must be based upon domicile (or its current equivalent — residence for a longer or shorter period of time). Unless one of the parties, at least, is domiciled in the divorcing State, the court in our view has no power to hear the merits of the controversy. This is so whether the court is that of a sister State or that of a foreign country (Williams v. North Carolina, 317 U. S. 287; Williams v. North Carolina, 325 U. S. 226; Caldwell v. Caldwell, 298 N. Y. 146; Senor v. Senor, 272 App. Div. 306, affd. 297 N. Y. 800; Alfaro v. Alfaro, 5 A D 2d 770, affd. 7 N Y 2d 949; Restatement, Conflicts, § 111; § 111, subd. a, Tentative Draft, 1953, § 113, 1948 Supp.; § 113, Tentative Draft, 1953). And it is equally clear that it is for us to decide whether there was domicile. There was no domicile here, no residence, or beginning of residence of either party. Upon general principles then the divorce is invalid.
*114 But it is said that the defendant husband filed a notice of appearance, by an attorney, and that this appearance confers '^“judicial jurisdiction upon the foreign court and precludes an inquiry into the basis in fact for its taking jurisdiction. A notice of appearance by itself has no such effect.
If we consider a divorce of a sister State, where the defendant has not appeared, we look into the question of the court’s judicial jurisdiction — 'of its power to proceed to hear the case. We determine for ourselves, by an independent inquiry, whether at least one side was domiciled in that State. If we find domicile, then we recognize the power of the first court to proceed and to compel the attendance of a defendant by service of a summons, no matter where effected. His nonappearance will then not avail him. Of course the burden upon a defendant who has not appeared and who questions the jurisdictional basis of the first court — domicile — is heavy; and if he fails, he suffers the consequence of having failed to respond to a court which could command his appearance. Those consequences are that domicile has been established, as well as the grounds for granting divorce. The defendant has had his chance and must take the consequences of his failure to present his case — either on jurisdictional grounds or on the merits — to the first court. Both aspects of the case are now foreclosed. The entire matter is res judicata. The application of the doctrine of res judicata in matrimonial matters is only an instance of its application generally.
Does a notice of appearance change the situation? (I of course have in mind the case where the defendant merely appears and does not contest the proceedings, permitting an ex parte determination to be made against him.) It does to this extent: We look to the decree to determine whether it recited a jurisdictional basis to proceed — domicile—and if we find it, we inform a defendant that we need go, we can go, no further into that question. Again by reference to the doctrine of res judicata a defendant is precluded from raising any question (I put aside fraud) relating to the jurisdictional basis of the divorcing court or to the merits of the controversy. Again, his appearance has the same consequences as in the case of a nonappearance in a court where we find there has been a domicile: inability on the part of a defendant to raise any of the questions he might have raised in the first court, including the question of domicile. The full faith and credit to be accorded the decree calls for a recognition of the doctrine of res judicata in either case — appearance or no appearance. The difference is that where there is no appearance, we look into the question *115 of domicile for ourselves; where there is an appearance, we accept the conclusion of the first court on the matter. Domicile there must be; the notice of appearance does not establish it; it merely precludes us from making a fresh inquiry into the matter.
It is against this background that language in the Glaser case (276 N. Y. 296) and in the Rhinelander case (290 N. Y. 31) must be read. We recognize divorces “ where people go to another State to obtain them ”, not because “ people went there ”, but because they took up residence there, even if in so doing they had only divorce in mind; and only when the divorcing State had “ jurisdiction ” over them. “ Jurisdiction ” here can only refer to jurisdiction by common-law standards; else elaborate discussions over the “full faith and credit ” clause, over domicile and res judicata become pointless. Full faith or no full faith, there are no barriers to parties establishing a domicile elsewhere with the purpose in mind of obtaining a divorce and “ resuming domicile here ” (cf. Glaser) after obtaining a divorce. For our purposes, they did establish a domicile. The record in the Glaser case disclosed a domicile in Nevada and in the Rhinelander ease the divorce was “ entered in the State where the husband had taken up his residence.
I am aware of decisions which treat of divisible divorce, wherein certain aspects of matrimonial litigation — finances, alimony, custody — are to be determined in accordance with principles relating to personal judgments; but those principles do not relate to status.
Is the matter different when we deal with a divorce obtained in a foreign country? If we are to assume that the connotations of “comity” are the equivalent of “full faith and credit ”, the scope of inquiry should be the same. Where a defendant living in New York is summoned to appear in a divorce action in a foreign country and fails to do so and a decree goes against him, the first question to be inquired into, if the validity of the divorce is before us, is whether the foreign court had jurisdiction to proceed, and, again, jurisdiction is based upon domicile within the territorial jurisdiction of the court. Assuming the equivalence of foreign decrees and decrees of sister States, the burden is upon the one challenging the decree to prove there was no jurisdiction — domicile. That equivalence does not exist; but burden or no burden, the question of domicile is for us to decide. If we decide there was, then we conclude, as we would in the case of a sister State, that because of the marital status the foreign court had power over the nonresponding defendant as well, and he must take the consequences of letting *116 the case against him go by default. If there has been an appearance (without contest thereafter), the same rules apply. A defendant had an opportunity to contest the jurisdiction of the court over him and the merits. He did neither and he cannot » ask us to re-examine those questions for him.
/ But the foreign court must have “ jurisdiction ” as we understand that term and not as the foreign court understands it; and I repeat it is not the notice of appearance that confers jurisdiction. It did not confer jurisdiction in the Caldwell case; both parties appeared as we understand appearance — through their respective attorneys. The Alfaro divorce was invalid because the plaintiff in the action had not acquired a domicile in Chihuahua. If he had, the defendant, served by mail in New York, would have been required to appear or take the consequences of not appearing. Again, assuming equivalence, if j there had been an appearance, with a finding as to domicile, we • would apply the rules of res judicata and prevent the defendant from reopening that question, however much the foreign concept of domicile and of proof of domicile may differ from ours. Questions as to how long the plaintiff had been in the foreign jurisdiction, how long he or she had intended to live there, would be foreclosed.
But what is the effect of a notice of appearance here on the question of domicile? None. Tt seems to me) There was no finding of domicile and we know that there was no requirement for .such a finding. What, then, does the notice of appearance add? The foreign court by its standards had jurisdiction over the defendant whether or not he appeared. If the court, notwithstanding its concept of jurisdiction irrespective of domicile, and notwithstanding its power under its own laws to proceed without making a finding on domicile, had in fact found that the plaintiff had been domiciled within its jurisdiction, the doctrine of res judicata might come into play. But that doctrine has no application here. The foreign court took jurisdiction because the plaintiff there presented her papers to it (she could have done it by attorney alone and without her physical appearance); the defendant could not question the jurisdiction; he did not (appearance was merely acquiescence in the assumption of jurisdiction) and the court made no finding on the matter that by our standards goes to the heart of the controversy — the power of the foreign court to proceed — but again power by reference to what we look for in a divorcing court, not power by the local standards. By its standards the question of domicile was irrelevant. That question is now here for us to decide; it was not adjudicated and it has not been rendered res judicata *117 by a notice of appearance. As I suggested in my opinion, we are not dealing with the consequences of a notice of appearance, followed by no contest, in a transitory action, a commercial transaction, for example.
I have assumed that decrees of a foreign country have the same force and effect as decrees of sister States. We know they do not. Yet by giving to a notice of appearance the effect sought to be assigned to it here, we are giving more ‘ ‘ faith and credit ” to such decrees than to decrees of sister States. Where there has been a notice of appearance, we at least look to the decree of the other State to see whether there has been a finding of domicile or a requirement of it implicit in the decree. What is argued here is that the notice of appearance leaves us powerless to inquire into the jurisdictional facts the foreign court relied on to establish its jurisdiction. We know that there was no basis other than the plaintiff’s request that the court take the case; the ease was submitted to the court and the court asks no more. We do not question the power of the court to take that position with regard to its own citizens and perhaps with regard to those whom it considers as being domiciled there. We do question the power when it concerns our citizens who, either by mail or by the personal appearance of one party, in lieu of mail, and by mail by the other party ask to be treated as though they were citizens or domieiliaries of the foreign country and to have their marital status determined upon request alone.
I cannot alter my own views, although, of course, I must defer to contrary views of appellate courts. I doubt whether I have the power to alter my conclusion at this time. The motion before me (not a motion for a new trial or for reconsideration, although on the argument of the motion, reconsideration on the basis of the Heine case was solicited) was made more than 15 days after my decision was filed (more than 15 days after publication): The argument in favor of the validity of the divorce, whether based on principle or upon authority, then will have to be presented to an appellate court here. I referred to the common assumption, as to the basic question here; it seems to be equally assumed that our highest court has not dealt with the precise question. The latter assumption, to be sure, ignores the genius of the common law which has the virtue of being able to decide a given case by reference to a principle that embraces the postulates of that case; in that respect the case has already been decided. I thought the principles governing divorces obtained in the manner of the one here called for my decision. The passing of years may have contributed to the spread of the common assumption as to their valadity but the supposed *118 absence of an authoritative ruling leaves open a vexing question. My views may not commend themselves elsewhere, but they may contribute to a final solution of the question.
This should leave the matter as I first decided it except for certain causes of action which I had ordered severed. The order to show cause asked for a final determination of all issues, including the right to a .separation and the attorney for the defendant stated that he had no objection to my passing upon those issues. Annulment makes a treatment of the issues of separation moot. But having in mind the nature of the proceedings, the questions involved, the contrary opinions expressed, I think I should go on to those issues so that if my views on annulment do not prevail, the appellate court will have the benefit of my views on the question of separation. So doing may make a new trial unnecessary.
Before taking up the other issues there are a few matters upon which I think a word or two .should be said. I now have before me (it had not been presented to me until after my decision) the Meredith separation agreement (Jan. 3, 1955) which immediately preceded the proceedings in Juarez. For its bearing upon the question of 1 ‘ divorce by agreement ” — by submission to a foreign jurisdiction which asks no more than such submission — I note that the agreement, after the usual provisions, including the one that its terms may be incorporated in a divorce decree recites that if there is no divorce by December 31, 1955 “ the agreement shall cease to be binding upon either of the parties for any purpose ”.
On the French marriage, the defendant may have been domiciled in New Jersey in the sense that he considered himself so and had a home there. He also had an apartment in New York, which he occupied with his former wife; his New Jersey home was being offered for .sale. The letter from the plaintiff’s attorney which I discussed in my opinion, no doubt referred to the defendant as a 11 New Yorker ”; and I think he was for present purposes even though his “ domicile ” may have been elsewhere. But the question is not as to his 1 ‘ domicile ’ ’ but that of the former husband of the plaintiff; the question is whether the plaintiff was entering into a bigamous marriage in France. She was if her former husband was still living and she had not been divorced. The plaintiff and her former husband were domiciled in New York at the time of their divorce; and if we would not recognize that divorce, it is plain to me that France would defer to our views and declare the French marriage void. But in any case, as the plaintiff’s attorney recognized we decide for ourselves the marital status of New York domiciliarles.
*119 The plaintiff asks for a reconsideration of the case upon the ground — now first urged — that assuming the divorce to be invalid, it is incumbent upon the defendant to prove that the Meredith marriage was a valid one, a marriage that Meredith had the capacity to contract. The counterclaim for annulment alleged that the plaintiff in December, 1953, was ‘ ‘ duly married ” to Kenneth A. Meredith in Mew York and that allegation, with awareness on the plaintiff’s part of its implications, was admitted. The defendant offered in evidence (I took it, over the plaintiff’s objection) the Meredith application for a license to marry the plaintiff — the objection was on the ground that ‘ ‘ it was not relevant to the issues ’ ’. The application stated that Meredith had been married once before and that his first wife was dead. The plaintiff now contends that there is no proof that the first wife was in fact deceased at the time of the Meredith marriage and consequently no proof that the Meredith marriage was a valid marriage. With a brief submitted after the argument, the attorney for the defendant supplied a death certificate from Georgia in apparent due form, but not properly authenticated, certifying to the death in Augusta, Ga., of ‘ ‘ Hazel Isabel Lament Meredith ’ ’, wife of ‘ ‘ Kenneth A. Meredith ”. The application for the Meredith marriage recited that Meredith had been married to ‘ ‘ Hazel Lamont Meredith ’ ’ and that he had last lived with her in Augusta, Ga. The discrepancy in the date of death (July 3, 1953 in the application; June 30,1953 in the death certificate) can be ignored. Assuming the matter has not been removed from the case by the pleadings and ‘ ‘ is relevant to the issues ’ ’, I think I should note that certificate now (I have initialled it; if the plaintiff has objections to it, she may state them when she submits findings as later directed; so far there has been no objection). With that certificate I think the matter is concluded.
One other matter remains: the question whether the attorneys of record are free to represent the defendant and also whether the giving of testimony by one of the members of the firm was in violation of a confidential relation that may have existed between the firm and the plaintiff and calls for the striking from the record of all testimony relating to the Chihuahua divorce which the attorneys learned from the plaintiff. As to the first, an objection raised only on the trial is unavailing. And as to the second, the testimony of the attorney Avas not objected to on any ground of privilege as between the attorney and the plaintiff and related to events following the bringing of this action. It was only on cross-examination that the attorney testified to his efforts about a year before this action was commenced *120 to secure payment of installments due under the Meredith separation agreement. There was no more than this. There was no testimony, even if we overlook the fact that the questions were asked by plaintiff’s attorney, relating to the facts of the Chihuahua divorce. The attorney had had nothing to do with that; and his testimony revealed only that his firm at the plaintiff’s request and upon the defendant’s suggestion had once attempted to collect a debt due the plaintiff. But whether that has any bearing upon the firm’s propriety in representing the defendant, is, I repeat, a matter that cannot be inquired into here.
The merits of the issue of separation will not detain me long, as they would not have detained me if it had not been for the claim of annulment. If there is no annulment neither side would be entitled to a decree of separation.
The marriage had really no firm foundation. This was the plaintiff’s fourth marriage — she is 38; the husband’s third— he is 54. The parties entered into a meretricious relation almost immediately upon their first meeting, while the defendant was still married. The plaintiff accepted the defendant’s bounty; she travelled to Europe with him and the two were sojourning in France while awaiting the defendant’s divorce from his former wife. They were married in France in August, 1959, a month after the defendant’s divorce. They had differences over financial arrangements, over the defendant’s interest in and devotion to geographical expeditions. In September, 1961, the defendant gave her $106,000, by way of loan or by gift. A few months after that he made her joint owner (joint tenancy) with him of an expensive duplex apartment which he had bought shortly upon their return from France.
Professing distress over her husband’s interest in another woman, the plaintiff in February, 1962 consulted a lawyer on the question of separation, and retained a detective to follow him; but only a few days before she sued (March, 1962) she obtained from her husband $2,050 for the rental of a villa on the Riviera, for the Summer of 1962. And these arrangements for the Summer were made after he had suggested to her when they had been in Switzerland earlier that they agree to order their lives separately — each to have freedom of action — with his plans including 1 ‘ the other ’ ’ woman. When suit was brought, husband and wife lived under the same roof, but occupied separate quarters.
The plaintiff’s action for separation has a twofold basis: Cruel and inhuman treatment and failure to support. The latter claim is entirely without basis. Up to the time of bringing this *121 action and thereafter the defendant provided for the plaintiff. She alone occupies their apartment, the maintenance charges of which are paid by him.
As to the first, the period complained of is of short duration — from October, 1961 to March, 1962. There is no claim of physical violence and although a separation may be granted for mental cruelty, it requires more than an assertion of such a ground to warrant a decree. Basically the plaintiff relies upon the defendant’s attentiveness to another woman as the ground, but considering the nature of the relation between husband and wife from their first meeting, I do not believe that the defendant’s conduct was so “ cruel and inhuman ” as to induce mental suffering or distress. Acts of attentiveness to another woman were not known to her until shortly before she brought suit; there was no public humiliation and what she learned could not have caused her the distress she complained of. She stated that she required medical care as the result of what she learned, her attorney represented that her doctor would testify, but there was no such testimony. Her social activities after she brought suit belie her claim of distress.
Living together in the same duplex apartment when a separation action is brought may not by itself defeat a cause of action for separation; but it tends to destroy, if it does not in fact destroy, a claim of 1 ‘ mental cruelty ’ ’. This is so when the wife is a person of some means — when leaving the apartment temporarily would not prejudice her legal rights and where she owned a home in Long Island.
Of course I do not say that the facts the plaintiff learned — coupled with the defendant’s suggestion of freedom of action — would not in a given case be grounds for a separation, but we are dealing with this case — with these two people, with their manner and style of living. The plaintiff has not satisfied me that she is entitled to a decree on the grounds of mental cruelty.
The defendant’s claim is no stronger. He asserts that the plaintiff has refused to cohabit with him since October, 1961. That is probably the fact. The plaintiff contends that her refusal was based on the defendant’s unwillingness to give up relations with the other woman; he, that it arose over financial questions, particularly his advances to his son by an earlier marriage. The testimony of the events in Vermont in October leads me to accept the defendant’s version in this respect. “ What was going on behind my [plaintiff’s] back at the time ” (the Vermont visit) referred to these advances and not to his relations with another woman. But again, whatever basis there *122 may be for a separation on this ground in other circumstances, there is no such basis here. The defendant was quite content with this arrangement, as his visits to the Pacific Coast to “the other woman ’ ’ proclaim. And this arrangement was no more and no less than he had suggested to his wife when they were in Switzerland.
This brings me to the remaining causes of action on behalf of the defendant — the third and the fourth.
The fourth counterclaim relates to the “ joint ownership ” of the apartment. The defendant bought the apartment on March 31, 1960 for $165,000; on December 19, 1961, with the consent of the landlord corporation (eff. Jan. 1, 1962) he transferred the ownership from himself to “ Walter A. Wood and Helena A. Wood, his wife, as joint tenants with right of survivorship ”. The transfer was by way of outright gift. The defendant, on the assumption his marriage is annulled, asks to have the property restored to him. He does so on the ground that the transfer was made in the belief that he was validly married to the plaintiff; that he otherwise would not have done so. I think he is entitled to the relief he asks. It is unthinkable that the gift would have been made, except for a belief in a subsisting marriage. It was already the matrimonial home; the plaintiff could call it ‘‘ her home ’ ’ at least during her lifetime without any documents of title and it was only because she was believed to be the wife, entitled to the ‘ ‘ security ” of a wife, that the transfer was made. To be sure the defendant did not say in so many words that he would not have made the transfer if he had not believed the plaintiff was legally his wife. His assertion to that affect would not be determinative; but the absence of a strict formula here should not prejudice him. It was not any statement by the plaintiff upon which he relied in making the transfer. That was done upon a mistaken belief as to his status. Both believed the relationship to be that of husband and wife; there was no fraud upon the part of either one — but there are no equities in favor of the wife such as existed in American Sur. Co. v. Conner (251 N. Y. 1).
The third cause of action asks for restoration of the apartment on the ground that the gift was made upon the plaintiff’s promise to be a “ good and dutiful wife ”; and would not otherwise have been made. There was no such promise, express or implied. The defendant simply made the transfer to his wife.
There will be an award to the plaintiff under section 236 of the Domestic Relations Law (former Civ. Prac. Act, § 1140-a). The defendant has been paying his wife $2,500 a month, in addition to paying the maintenance charges of the apartment. *123 The plaintiff has some means of her own, and owns the home in Long Island. But she did live lavishly with the defendant and I think she should receive $1,600 a month until the further order of the court. The attorneys for the plaintiff have received no compensation; there was no court order. There will be an award to them of $10,000, plus disbursements incurred.
Submit proposed findings and decree and order within five days of the publication of this memorandum.