Henry Clay Greenberg, J.
Plaintiff Lewis S. Bosenstiel has invoked the authority of this court to annul the marriage which he entered into on November 30, 1956, in the City and State of New York, with the defendant Susan L. Bosenstiel. This marriage, plaintiff contends, cannot be afforded the legal aegis of validity as a purported Mexican divorce dissolving defendant’s prior marriage to one Felix E¡. Kaufmann must be rejected as a nullity under the laws of New York. The defendant denies the invalidity of the Mexican divorce and affirmatively urges the complete defense of res judicata predicated upon an “incidente” proceeding instituted in 1962 in Mexico by one Samuel Goldsmith, who, defendant alleges, was in reality the plaintiff.
The issue, in essence, therefore, is the effect to be accorded the divorce decree of the Mexican court. The resolution of this issue, in its effect on the fortunes of the defendant and its likely application to others similarly situated, requires the court to approach the disposition with caution, and yet with due regard to its duty and the recognition it must give to the public policy of this State. The unfortunate result in relation to the individual defendant must yield to the law of this jurisdiction.
In limine it is well to dispose of certain preliminary matters made necessary by certain rulings during the trial.
1. A motion was made to strike certain testimony of the witness Benjamin Javits on the ground that it was improper when admitted and timely objection was taken by plaintiff, that other testimony was improperly admitted although no objection was taken thereto, and that other testimony which was proper when admitted was subsequently shown to be inadmissible. The court has authority to grant such a motion during, at the time of, and after the trial has been concluded. It would serve no useful purpose to detail this improperly admitted testimony in extenso since the court in the main sustained objection to the testimony of the witness Javits on the ground of attorney-client privilege. Defendant urged that the fact that plaintiff *464 instituted an action against his former attorney, Benjamin davits, for an accounting and other relief, the privilege was waived for all purposes and for all time. This is not the law (see Matison v. Matison, 95 N. Y. S. 2d 837, affd. 277 App. Div. 770). The exceptions sought to be engrafted upon the rule of attorney-client privilege by the defendant are without legal force and if accepted would in effect destroy this privilege which has long been recognized and accepted in the law.
Matter of Stefano v. Ward, Inc. (19 A D 2d 473) asserted by the defendant as completely supporting her position, is not remotely applicable here. In that case there was an issue as to whether a judgment obtained by an injured employee against a third party was really the result of a compromise arrived at without the consent of the employer’s insurance carrier. Hearings were held before a Referee on the contested issue and the attorneys representing the injured workman and a third party refused to answer questions relating to arrangements which had been made between them leading to the judgment. The court held that such conversations were not privilege. Said the court (p. 475): “ We hold merely that the conversations between adverse attorneys at pretrial proceedings are open to inquiry by the board where they are pertinent, as they are here, to a substantial right.” The situation here is opposite. It is not communications between adverse attorneys which are sought to be protected but rather the confidential communications between a client and his attorney. The endeavor by defendant’s attorneys to circumvent the rule by attempting in effect to try the issues between plaintiff and his former attorney embraced in the accounting action and thus remove the privileged matter, did not escape the scrutiny of the court.
2. Testimony regarding certain alleged improper acts in the ‘ ‘ Goldsmith incidente ’ ’ proceedings was not admitted on the ground that it would have no material effect on the outcome of the litigation. This testimony, as urged by the defendant, was sought to be introduced for the purpose of (a) showing a “ consciousness of a weak case ” and (b) tainting the credibility of witnesses for the plaintiff herein. Extensive discussion is unnecessary as it is quite obvious that the proposition of law regarding fraudulent practices as espoused by the defendant has no application to the case at bar. This will be discussed more fully in relation to the merits of the defense of res judicata.
3. We come now to the defense of res judicata which was and is vigorously advanced as determinative of the instant litigation. On October 2, 1954, defendant’s prior husband, Felix E. Kaufmann, obtained a decree of divorce from her in the First *465 Civil Court of Bravos, Ciudad Juarez, Mexico. In 1962 one Samuel Goldsmith commenced an ex parte “ incidente ” proceeding which resulted in the granting of a decree on February 6, 1962, nullifying defendant’s 1954 divorce. It is now contended under the defense of res judicata that the aforesaid Samuel Goldsmith was in fact the plaintiff herein, Lewis S. Rosenstiel. This allegation of course is denied by the plaintiff.
On June 7, 1962, when she learned of the nullification decree entered in the First Civil Court of Bravos, defendant Susan Rosenstiel filed a constitutional proceeding known as an 11 amparo ’ ’ in the Mexican Federal Court. In that proceeding defendant claimed that the ex parte nullification order entered in the State court at the behest of Samuel Goldsmith was void, alleging among other things that it was entered without notice to her and in derogation of her rights of due process guaranteed by Mexican federal statutory and constitutional law. That court, on November 27, 1962, refused to grant the “ amparo ”. The court ruled that defendant had not instituted that proceeding within the prescribed time. She appealed from this adverse decision of the Second District Court to the Federal Court of Appeals for the Third Circuit, City of Saltillo, State of Coahuila, Mexico. The Federal Court of Appeals reversed the decision of the Second District Court and on May 10, 1963, granted the “ amparo ” and simultaneously remanded the file to the court below for appropriate action in accordance with the decision. The Second District Court thereupon, and this appears from the May 28, 1963, decree, notified the State court of the Appellate Division and instructed it to the effect that the State court must incorporate the federal decision in its record.
Thereupon, the State court entered a resolution revoking the Goldsmith ex parte nullification and stated that accordingly, ‘ ‘ the entire proceeding in the divorce proceeding is legal because brought by Mr. Felix Ernest Kaufmann against Mrs. Susan E. Kaufmann as well as a divorce judgment rendered on October 2, 1954, which was declared final on October 6, 1954 ’ ’ remained valid.
Thereafter and on February 4, 1964, the defendant, pursuant to leave granted by the court, served a supplemental answer alleging the defense of res judicata based upon the order entered in the First Civil Court of Bravos, Juarez, State of Chihuahua, Mexico, on May 28, 1963. A motion was made to strike this defense, plaintiff contending that since there had been no decision on the merits as to the validity or invalidity of the 1954 divorce decree, the defense of res judicata was *466 legally insufficient. The court at Special Term (Hellmax, J.) denied the motion to dismiss, holding that two issues of fact were involved: (a) was the Goldsmith who instituted the January, 1962 proceeding in reality the plaintiff; (b) was the final determination of the Mexican appellate court in May, 1963 a judicial determination on the merits of the issues raised by Goldsmith in the nullification proceeding or was it, as plaintiff contends, a vacatur based solely on the absence of notice to defendant of the institution of the proceeding so as to render the determination a procedural one only? Expert testimony was produced by the contending parties with respect to Mexican law and the effect of the decree of the Mexican appellate court.
Since the determination of foreign law is for the court, this issue was taken from the jury. The court on this issue concludes as follows: (1) It is elementary that res judicata as a defense may be invoked only where the, same parties and issues were before the court and there was a definitive determination of the contested issues on the merits. Citation of authority for this well-recognized principle would be a work of supererogation. It is sufficient to state that where the. record is indefinite as to whether the merits bottomed'the prior judgment it is not conclusive and hence res judicata as a defense must falff^Moreov'eT. a judgment dismissing an action based upon a technicality is not a judgment upon the merits and hence cannot sustain a defense of res judicata. Based upon the expert testimony in the case and its own exhaustive search of the authorities, the decision of the Saltillo court or the decree entered pursuant to that decision by the First Civil Court of Bravos did not make any finding with respect to the validity of the divorce decree obtained by Felix Kaufmann against the defendant in 1954. All that the Saltillo court did was to reverse the decision of the lower federal court which refused to consider the “ amparo ” petition and to grant the “ amparo ” — thus determining that the acts complained of or the proceedings in the Goldsmith “incidente” action which resulted in the nullification of the divorce decree were unconstitutional. In essence, this decree set aside the previous nullification decision and permitted the divorce decree to stand as it was before the Goldsmith nullification proceedings were undertaken and this decision was predicated on the lack of notice to Mrs. Rosenstiel in the “incidente” proceeding. A complete search of the record fails to disclose that the appellate court examined the merits of the findings made by. the “incidente” court. Moreover, it is crystal clear that there was no determination *467 by any of the Mexican courts that the 1954 divorce was valid in New York under New York law as obviously it could not determine.
Additionally, the Saltillo court did not have the power under Mexican law to decide the issue of the validity of the divorce on the merits even if such issue had been raised and thus any determination or finding by the Saltillo court with respect to defects in the divorce was immaterial to its decision and could not result in res judicata in this action. Under the provisions of the Mexican law regulating “ amparo ” as demonstrated by expert testimony, the scope of inquiry of an “ amparo ” court is limited to the acts complained of in the 11 amparo ’ ’ petition. Thus its power was limited to a determination of the validity of the Goldsmith “incidente” proceedings.
It is the conclusion of this court that the £ £ amparo ’ ’ court could not have made under Mexican law any determination as to the validity of the 1954 divorce other than to set aside the nullification proceedings and leave the divorce decree in Mexico as it was before the nullification decree. Any findings which the Saltillo court might have made with respect to the defects in the divorce proceedings claimed by Goldsmith or found by the Chihuahua court which nullified the divorce were immaterial to its decision and could not operate as res judicata here.
If we should accept the decision of the Mexican court as a determination of the merits of the validity of the divorce under Mexican law and going a step further, assuming that the plaintiff in this action was in fact Goldsmith in the Mexican proceeding, the decision of the Saltillo court nevertheless would not be res judicata since the validity of the divorce under New York law was not in issue, nor was it decided; and even if it had been litigated and decided, it would not be binding on this court.
It is obvious that assuming all of the facts to be as claimed by the defendant, all that she extracted from the decisions and judgments in the Goldsmith proceedings, including the subsequent “ amparo ” decisions and decrees entered therein, is an affirmation of the validity of the 1954 Mexican divorce according to Mexican law. Therefore, on the issue of res judicata the court holds with the plaintiff and dismisses the defense on the facts and as a matter of law.
We return, therefore, to the principal issue in this case — should the divorce decree of the Mexican court in the case of Kaufmann v. Kaufmann (the defendant herein) be recognized in this jurisdiction? In mid-1954 the defendant and her first husband agreed in New York, where both had been domiciled since their marriage in 1945, to divorce each other. A New York *468 attorney was engaged. (The defendant in this case claims that the attorney was engaged by her then husband, Kaufmann; Kaufmann in his deposition says that his then wife engaged the attorney; and the Mexican attorney, Mr. de la Torre, called to the stand by defendant, testified that he was retained by the New York attorney acting on behalf of the defendant in this case, the present Mrs. Rosenstiel.) Mr. de la Torre testified, without contradiction, that he was retained to effectuate the planned dissolution of the Kaufmann marriage; he, in turn, selected two resident State of Chihuahua attorneys, one of whom had been recommended by the other, to represent Mrs. Kaufmann and forwarded the necessary documents, including a power of attorney executed by Mrs. Kaufmann, to them. Financial compensation for the services was provided by Mr. de la Torre, for both Mexican attorneys resident in Mexico, who had received an all-inclusive fee from the New York attorney.
In view of section 51 of the Domestic Relations Law of the State of New York, the testimony of the witness de la Torre is recited in part to show the brazenness of the conception and the execution of the arrangement for the procuring of a Mexican divorce by the defendant.
“the witness: Well, Mr. Floria, a New York attorney, he got in touch with me in representation of Mrs. Kaufmann (the defendant Mrs. Rosenstiel) and told me that they were interested in securing a decree of divorce in Mexico before the Mexican courts and that he was engaging me to supply the attorneys for the divorce, give him that service and supervise the divorce.
‘1 the court : Do I understand you retained the attorney for the plaintiff at the request of Mr. Floria?
“ the witness: That’s right.
“ the court: Who was the attorney for Mrs. Kaufmann?
“ the witness: That’s right.
‘ ‘ the court : And you also retained the attorney for the defendant in that case?
“ the witness: Yes, because I am — yes, sir.
“ Q. You give advice to other lawyers, is that it? A. That’s correct.
“ Q. On Mexican law? A. Yes, sir.
“ Q. Mr. de la Torre, are you a member of the New York Bar? A. No, sir.
“ Q. Did you take care of the fee of Mr. Lopez and Mr. Trias (the former represented the defendant and the latter represented Mr. Kaufmann) ? A. Yes.
“ Q. In other words, Mr. Floria gave you enough money to take care of your own fee and their fees? A. Correct, yes.”
*469 Mr. Kaufmann, who planned a trip to the western part of the United States, agreed to be present in Ciudad Juarez in order to obtain the divorce. As he had departed prior to the completion of all arrangements for the divorce, instructions informing him that a Mr. Trias in Ciudad Juarez had been retained as his attorney and that he was to appear at Mr. Trias’ office on the morning of October 1, 1954, were forwarded to him by mail immediately prior to the fixed date Mr. Kaufmann travelled to El Paso, Texas, and registered at the Del Camino Motel.
On the morning of October 1, 1954, Mr. Kaufmann drove by taxi to the International Bridge leading to Ciudad Juarez, walked across the bridge, and then proceeded to his appointment with Mr. Trias. Without any delay, Mr. Trias guided Mr. Kaufmann to what the latter has identified in his testimony as the courthouse. There Mr. Kaufmann was instructed and did sign “ some kind of register ”. Pursuant to further directions, he swore to the accuracy of some document [the complaint], written in Spanish, and signed it, although, in fact, he was not aware of its contents. All of the discussions and transactions were conducted in Spanish, a language with which Mr. Kaufmann professed no familiarity. Within approximately one hour from his arrival in Mexico, Mr. Kaufmann returned to El Paso, Texas. Except for this one-hour presence to transact the foregoing, Mr. Kaufmann had never been in Ciudad Juarez, Mexico, nor has he returned at any subsequent time.
Of critical significance, and defendant does not deny this, at no time in his life did Mr. Kaufmann become a domiciliary of any part of Mexico.
On the following day, the Mexican lawyer, Heber Lopez, appeared on behalf of Mrs. Kaufmann, expressly submitted to the jurisdiction of the court, renounced all other jurisdictions, confessed to the allegations of the complaint and, too, requested the divorce decree. The decree was granted on October 2, 1954 and it is valid in Mexico.
"Jurisdiction of the court rendering the decree constitutes the ultimate touchstone for the adoption or rejection of the foreign judgment as a part of the law of New York. ‘ ‘ Under our system of law, judicial power to grant a divorce — jurisdiction, strictly speaking — is founded on domicile [citing eases]. The framers of the Constitution were familiar with this jurisdictional prerequisite, and since 1789 neither this Court nor any other court in the English-speaking world has questioned it.” (Williams v. North Carolina, 325 U. S. 226, 229.)
Domicile as the sine qua non requisite for jurisdiction to grant a divorce is rooted in the basic concept of social rights and *470 obligations in the marital res. The marriage contract creates not only personal rights and obligations, but transcending these, there arises a social — the State’s interest in the marriage. “ The authority of a court to dissolve the marriage band, therefore, must rest upon the authority of the State over the marriage, requiring that at least one of the parties be a domiciliary of this State ”, (Senor v. Senor, 272 App. Div. 306, 311, affd. 297 N. Y. 800.)
A divorce granted by a sister State, provided the requirements of procedural due process are met, is “ entitled to a presumption of validity under the ‘ full faith and credit ’ provision of the Federal Constitution ” (Rosenbaum v. Rosenbaum, 309 N. Y. 371, 375), and is subject to only very limited collateral attack (Johnson v. Muelberger, 340 U. S. 581). “ However, we have never held that any such presumptive legality and validity must be accorded Mexican divorces — which are, of course, beyond the scope of 1 full faith and credit ’ [cases cited]. Judgments of courts of foreign countries, we said in Martens v. Martens (284 N. Y. 363, 365), ‘ differ from judgments of courts of our sister States to which, by constitutional mandate, full faith and credit must be given. They must not contravene our public policy ’. Thus, under comity — as contrasted with full faith and credit — our courts have power to deny even prima facie validity to the judgments of foreign countries for policy reasons, despite whatever allegations of jurisdiction may appear on the face of such foreign judgments. '* * # It is therefore clear that the recognition of a foreign country judgment is far less certain, the judgment itself is far more assailable and vulnerable, than sister State judgments, and is subject to a test of policy. There is thus no significant basis for treating sister State and foreign country divorce judgments as identical in legal effect within this State.” (Emphasis ours.) (Rosenbaum v. Rosenbaum, supra, pp. 375, 376.)
Decisional precedents thus mandate a determination by this court of whether the Mexican court which rendered the Kaufmann divorce decree possessed jurisdiction over the marital res based on domicile.
The decree itself recites in relevant part that, ‘1 This court (Mexican) has jurisdiction to decide the present case according to article 22 and 24 of the Law of Divorce, because the plaintiff proved that he is registered in the municipal registry of this city in accordance with the law at the time that he started this suit, and in accordance with article 23 of the same law, because both parties submitted expressly to the jurisdiction of the undersigned judge.”
*471 The jurisdictional recital in the decree refers to the three articles of the Divorce Law of the State of Chihuahua which provide:
I ‘ Article 22. The judge competent to take cognizance of a contested divorce is the one of the place of residence of the plaintiff; and to take cognizance of the one by mutual consent, the one of the residence of either of the spouses.
“Article 23. Competence may also be fixed by express or tacit submission. Express submission exists when the parties concerned renounce clearly and conclusively that forum which the law accords to them, and designate with all precision the judge to whom they submit. Tacit submission exists by the fact that the plaintiff files his complaint, or by the fact that the defendant, after having- been summoned in proper form, does not timely raise the lack of competence, or, after having raised it, desists therefrom.
II Article 24. Residence for purposes of article 22 of the present law shall be proved by the respective certificates of the Municipal Register of the place.”
In arriving at an understanding of the foregoing specific provisions of the Divorce Law of the State of Chihuahua, within the context of the fundamental concepts of the law of that State and of Mexico, this court is indebted to the expert witnesses from that country.
Contrary to our concept of the marital res and jurisdiction predicated upon domicile, submission of the parties to the power of the court constituted the essence and the source of jurisdiction to grant a divorce in the State of Chihuahua. Domicile is superfluous. A marriage may be dissolved by mutual consent, ' in which case a single petition is presented to the court, or by a “contested” divorce, which latter classification comprehends a divorce in which the defendant admits the allegations of the complaint and requests that the decree be granted. The domiciliary State’s interest in the marital res upon which our law is based represents an alien concept to the law of the State of Chihuahua. The Divorce Law does not distinguish between “inhabitants” and “transients”. Instead, any “requirement of residence ” in the law more closely approaches our doctrine of venue and can be waived by “ express ” or “ tacit submission ”.
Consonant with the Divorce Law of the State of Chihuahua, it cannot be gainsaid that the Kaufmann divorce decree rests upon a jurisdictional recital which need not comprehend domicile; consonant with the undisputed facts of the Kaufmann divorce and the uncontroverted conclusions arising therefrom, *472 it cannot be gainsaid that the Kaufmann divorce decree rests upon a jurisdictional recital which does not comprehend domicile.
Precedent and policy mandate the rejection of the Kaufmann decree in the State of New York. In Rosenbaum v. Rosenbaum (309 N. Y. 371, supra) the defendant husband did not deny that he had “ appeared in Mexico * * * solely for the purpose of signing divorce papers and not for the purpose of residing there ” (p. 374). Even though, in that ease, the husband’s Mexican petition alleged that he was a resident of Mexico, ‘1 ‘ and in that virtue you are thereby competent to hear and try my case’” (p. 379) the Court of Appeals declared (p. 376) that the action was “ a clear legal nullity under the allegations of plaintiff’s complaint, and of no more validity than a so-called mail-order divorce ’ ’. The Kaufmann divorce decree can be accorded no higher legal status.
Nor was the jurisdictional infirmity in the Kaufmann decree cured by the patently collusive arrangement to submit to the power of the State of Chihuahua and to renounce the authority of the State of the marital res, i.e., New York. The defendant and Mr. Kaufmann violated the express interdiction of section 51 of the Domestic Relations Law of New York which forbids any agreement between a husband and wife “to alter or dissolve the marriage ”. “ They violated our statute embodying our public policy * # *. Their collusive agreement and conduct may not be the foundation for the creation of any rights ’ ’ (Caldwell v. Caldwell, 298 N. Y. 146, 150).
In a penetrating and well-considered opinion, Mr. Justice Coleman, in Wood v. Wood (41 Misc 2d 112) reached the same conclusion. There the parties had entered into a separation agreement, both were domiciled in and residents of New York. The plaintiff there went by plane from New York to. Juarez in Chihuahua. The same day, or the next, she appeared in court with an attorney and filed a complaint against her husband asking for a divorce on the ground of incompatibility of temperament— a recognized ground in ■ Chihuahua. Immediately thereafter she returned to the United States. • The defendant husband appeared by Mexican attorney, authorized to appear by virtue of a power of attorney mailed to that attorney from New York. The husband did not go to Chihuahua. The answer admitted the allegations of the complaint and thereupon a decree was entered.
Justice Coleman, in rejecting recognition to this decree, emphasized that before New York will recognize a divorce obtained by New York domiciliaries in another State (be it a sister State or a foreign State), that State must have had juris *473 diction over the marital res, which jurisdiction must be based upon the domicile or bona fide residence of one of the parties.
In language pertinent here, the learned court said (p. 113): “ I think we may start with the premise that a court granting a decree of divorce must have ‘ jurisdiction ’ over the controversy between the parties. Because of the nature of the case — involving marital status — jurisdiction must be based upon domicile (or its current equivalent — residence for a longer or shorter period of time). Unless one of the parties, at least, is domiciled in the divorcing State, the court, in our view, has no power to hear the merits of the controversy. This is so whether the court is that of a sister State or that of a foreign country (Williams v. North Carolina, 317 U. S. 287, Williams v. Williams, 325 U. S. 226; Caldwell v. Caldwell, 298 N. Y. 146; Senor v. Senor, 272 App. Div. 306, affd. 297 N. Y. 800).”
Continuing, the court, in the Wood case, said further (p. 113): ‘1 And it is equally clear that it is for us to decide whether there was domicile. There was no domicile here, no residence, or beginning of residence of either party. Upon general principles then the divorce is invalid.” Defendant has attempted to distinguish the Wood case on the ground that Felix Kaufmann in the instant case satisfied the residence requirements of Chihuahua by obtaining a certificate of residence. In other words, it is contended that on such a state of facts the Chihuahua court obtained a stronger position upon which to predicate jurisdiction. There is no merit to this contention as it will be observed that there are no requirements in Chihuahua that the party appearing in person be a bona fide resident or domiciliary in order to obtain a divorce. The Divorce Law of the State of Chihuahua contains two alternative jurisdictional provisions. The divorce under challenge here was based upon both article 23 (submission by the parties) and articles 22 and 24 (residence of the plaintiff). It would seem that the appearance by one of the parties under article 23 is mere surplusage and makes no difference whatsoever between the kind of decree so obtained and a mail-order divorce (see Caldwell v. Caldwell, 298 N. Y. 146, supra).
Articles 22 and 24 of the Divorce Law of Chihuahua authorize the court to exercise jurisdiction predicated upon the “ residence ” of at least one of the parties. “ Residence ”, for the purpose of these articles, is defined as personal registration with the Municipal Clerk at the City Hall, the act of registration constituting a jurisdictional act which is recited in a divorce decree,
*474 The testimony of this case has established that the obtaining of a certificate of residence is a mere formality with no prerequisite that the party be in Mexico for any length of time or to state any intention to become a resident. By the standards of Chihuahua the question of domicile was completely irrelevant and therefore the crucial issue is now before this court for decision. It was not adjudicated in the Mexican court and has no binding effect on this jurisdiction.
The situation is aptly summed up, to quote again from Mr. Justice Coleman’s decision in the Wood case: " We do not question the power of the court [in Mexico] to take that position with regard to its own citizens and perhaps with regard to those whom it considers as being domiciled there. We do question the power when it concerns our citizens who, either by mail or by personal appearance of one party in lieu of mail, and by mail by the other party ask to be treated as though they were citizens or domiciliaries of the foreign country and to have their marital status determined upon request alone.” (41 Misc 2d 112, 117.)
Similarly, the Court of Appeals in Caldwell v. Caldwell (298 N. Y. 146, 149, supra) which invalidated a Mexican mail-order divorce, said: " Domicile is the controlling factor. This is made abundantly clear in the following language of the majority opinion (Frankfurter, J.) in the second Williams v. North Carolina case [325 U. S. 226] (supra, p. 229): ‘ Under our system of law judicial power to grant a divorce — jurisdiction, strictly speaking — is founded on domicile ’ ”.
The conclusion here is irresistible that the Mexican decree in Kaufmann v. Kaufmann has no validity in this jurisdiction and will therefore not be recognized.
At the end of the entire case the court withdrew the case from the consideration of the jury on the ground that while defendant in an annulment action is entitled to a jury trial as a matter of right on the issuable facts, there were no facts here for determination by the jury. Res judicata is an issue for determination by the court and such other issues as may appear in the case resolve themselves into questions of law. There was thus nothing for the jury to decide and accordingly it was discharged from further consideration of the case at the conclusion of the trial. Plaintiff moved for judgment. Defendant moved to dismiss the complaint on grounds of legal insufficiency and other grounds and for judgment in her favor. The defendant urged upon the court’s consideration the argument that by attacking the validity of his purported marriage to the defendant the plaintiff bears the burden of "proving the negatives ”. In his extensive argument counsel for the defendant has misconstrued the doctrine *475 of “ proof of negatives What the defendant is saying is that the plaintiff must prove that the defendant and Kaufmann did not obtain another divorce after the Mexican divorce of 1954, that is, between 1954 and November 30, 1956, when she married plaintiff herein. We start with the clear facts that defendant married Kaufmann on January 12, 1945, in Beno, Nevada. Kaufmann is still living. These two facts are admitted in her answer and testimony; and further, we have the evidence by Kaufmann, through Kaufmann’s deposition taken in 1963, that he was then living. Even if this court were to accept defendant’s theory of proof of negatives, the only remotely possible issue is whether Felix and Susan Kaufmann might have obtained another divorce between October 2, 1954, and November 30, 1956. Even if such a remote possibility existed, it has been conclusively disputed by the testimony of Kaufmann taken in his deposition and read into evidence by the defendant as cross-examination and defendant on the stand did not dispute this part of Kaufmann’s testimony. In fact, her “ affidavit for license to marry Lewis Bosenstiel ”, which she put in evidence, states that her only divorce was the October 1954 Mexican divorce.
In any event, defendant having admitted such marriage and not having raised any issue as to its validity, cannot now at this late date be heard to question it.
The cases cited by the defendant dealing with negatives are not here pertinent and do not demonstrate an inadequacy in plaintiff’s proof with respect to the situation as it existed before, during, and after the Kaufmann marriage. Unfortunately, counsel for the defendant quoted extensively from Surrogate Hildreth’s opinion in Matter of Newins (29 Misc 2d 614); that case was cited as the authority which required plaintiff herein to prove every possible and conceivable fact imaginable before a court of law will declare a marriage null and void. The court was astounded to find that that case upon which so much reliance was placed by defendant’s counsel was reversed by the Appellate Division (16 A D 2d 436) on the point in question, and this reversal was affirmed by the Court of Appeals (12 N Y 2d 824). In fact, the Appellate Division in commenting upon the Surrogate’s theory of the presumptions of validity of a marriage and legitimacy of issue adopted the words of Justice Cakdozo to the effect that this theory of such presumption is a presumption “ gone mad ”. Said the court (pp. 440-441): “ The Surrogate has held that there was lack of satisfactory proof of the validity of the testator’s first marriage. Such holding is an example of what is characterized in Matter of Findlay (supra, *476 p. 13 [253 N. Y. 1]) as 1 the presumption of legitimacy gone mad. ’ * * * We appreciate that the Surrogate was animated by the most laudable of motives in endeavoring to preserve as lawful the marriage of testator and Esther; but there is no alternative to the conclusion that that marriage was void. ’ ’ The other cases carry no greater force. Accordingly, the court directs judgment in favor of the plaintiff for the relief demanded in the complaint. Settle judgment which shall provide for a hearing with respect to alimony and counsel fee, which the court decrees in its discretion under the circumstances of this case that defendant is entitled to recover.